**Exhibit B**

**To**

**PETITION TO RECOGNIZE, CONFIRM
AND ENFORCE A FOREIGN ARBITRATION AWARD**

**VERIFICATION and CERTIFICATION OF THE AGREEMENT TO ARBITRATE**

Vassilios Livanos, pursuant to the provisions of 28 U.S.C. § 1746, hereby declares and states as follows:

I am the Commercial Director and a duly authorized agent of Probulk Carriers Limited, which is the Petitioner in this action.

I am familiar with Petitioner Probulk Carriers Limited's disputes with Respondent Marvel International Management and Transportation, I am familiar with the Final Arbitration Award referenced herein and I am familiar with the Petitioner's efforts to collect the amounts due under the Final Arbitration Award.

The attached is a true and certified copy of the Time Charter Party Agreement, dated May 7 2008, between the Petitioner Probulk Carriers Limited and the Respondent Marvel International Management and Transportation, which sets forth the parties' arbitration agreement at clauses 17 & 48.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 16, 2014
New York, New York

Vassilios Livanos

# Time Charter

GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1. *This Charter Party*, made and concluded in ........*Piraeus...7th... day of ...May... 30,2008*..........
2. Between.....*PROBULK CARRIERS LIMITED - disponent*...........................................................
3. Owners of the good........*Korean flagged.*........*Steamship/Motorship.... M.V. "IOANTHI"*...................of..........
4. of...............~tons gross register and~...................~tons net register, having engines of~.............~...of~
5. ~power and with hull, machinery and equipment in a thoroughly efficient state, and classed~.......~at~..............of
6. about...........................~able to first bale capacity and about~.............~tons of 2240 lbs. deadweight capacity (cargo~
7. ~and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~
8. ~allowing a minimum of fifty tons) on a draft of.........feet...Inches on~...................~summer freeboard, inclusive of~
9. ~permanent bunkers, which are of the capacity of about~.............~tons of fuel, and capable of steaming, fully laden,~
10. ~under good weather conditions.........about~.............~knots on a consumption of about~.............~tons of best Welsh~
11. ~coal best grade fuel oil best grade Diesel oil, See Clause 33 for further description.~
12. now.........~trading~.............................................................................Charterers of the City
13. and.....*MARVEL INTERNATIONAL MANAGEMENT AND TRANSPORTATION*...........................................................
14. of...........................................................................................................................
15. Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the
15. time of delivery, for about...*a time charter period via safe port(s), safe berth(s), safe anchorage(s), always afloat,*
    *always within Institute Warranty Limits starting between 31st December 2008 and 15th March 2009 and lasting*
    *upto earliest 15th of January – latest 15th of February 2010.......................................................*
16. ...............*within below mentioned trading limits. Charterers not to trade vessel breaking IWL unless*
    *Owners' prior consents obtained which not to be unreasonably withheld. Charterers to pay add premium for*
    *breaking IWL against copy of original vouchers but always max. as per LLOYDS of London scale.*
17. *Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers*
18. remaining responsible for the fulfillment of this Charter Party.
19. Vessel to be placed at the disposal of the Charterers, at on ..............................................................
20. ..................................................................................................................................
21. dropping last outward Sea Pilot or passing one safe port world wide at any time day or night Sundays and
    Holidays included
22. ..................................................................................................................................
23. ..................................................................................................................................
24. ~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as~
25. ~otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time~
26. ~to count as provided for in clause No. 5. Vessel on her delivery to be ready to receive any permissible cargo with~
27. ~clean swept holds and tight, staunch, strong and in every way fitted for the ordinary cargo service, having water~
28. ~ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other~
29. ~power sufficient to run all the cranes winches at one and the same time (and with full complement of officers, seamen,~
30. ~engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, including~
31. ~petroleum or its products, in proper containers, excluding.................. See Clause 41........................~
32. ~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a~
33. ~small number as deck cargo at their risk, all necessary fittings and other requirements to be for account of Charterers) in~
34. ~such lawful trades, between safe port and/or ports in British North America and/or United States of America, and/or~
35. ~West Indies, and/or Central America and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South~
36. America, *world wide trade always via safe port(s), safe berth(s), safe anchorage(s), always afloat,* ~and/or~
37. ~always accessible, always within IWL . See Clause 4A......~......................~and/or Europe and/or Africa, and/or Asia,~
38. ~and/or Australia, and/or Tasmania and/or New Zealand, but excluding Magdalena River, River St. Lawrence~
39. ~between October 31st and May 15th y, Hudson Bay and all unsafe ports; also excluding when out of season, White Sea,~
40. ~Black Sea and the Baltic.~
41. ..................................................................................................................................
42. ..................................................................................................................................
43. ..................................................................................................................................
44. as the Charterers or their Agents shall direct, on the following condition:

1/5

1

45.   1. That the Owners shall provide and pay for all provisions, wages, and consular shipping and discharging
46.   fees actual expenses incurred, including but not limited to additional agency fee charged by agents for performing
47.   crew/Owners' matter of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room
48.   and other necessary stores, including boiler water and maintain her class and keep the vessel in a thoroughly efficient
49.   state in hull, machinery and equipment for and during the service.
50.   2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port
51. Charges, customary and/or recommended Pilotages including pilotage in Bosporus and Charterers will pay
52. customary ease and pilot requested by Master including in Dardanelles and Great Belt, Magellan Strait, Agencies,
53. Canal tolls, Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses
54. except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all
55. such charges incurred shall be paid by the Owners.
56. Fumigations ordered because of illness of the crew or cargoes carried prior to delivery to be for Owners' account.
57. Fumigations ordered because of cargoes carried and/or cargoes intended to be carried or ports visited while vessel is
58. employed under this charter to be for Charterers' account. All other fumigations to be for Charterers account after
59. vessel has been on charter for a continuous period of six months or more.
60.   Charterers are to provide necessary dunnage, lashing material, and shifting boards, also any extra fittings
61. requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards
62. already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any
63. damage thereto.
64.   3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and
65. pay for all fuel remaining on board the vessel at the current prices in the respective ports the vessel to be delivered
66. with not less than .................................... tons and not more than .................................... tons and to be re-delivered with not
67. less than .................................... tons and not more than .................................... tons and to be re-delivered with not
68.   4. That the Charterers shall pay for the use and hire of the said vessel at the rate of... USD 43,500 per day
69. pro rata daily
70. including overtime, payable 15 days in advance to Owners' nominated bank..........United States Currency per
71. ton on vessels total deadweight carrying capacity, including bunkers and stores, on .................................... summer freeboard,
72. per Calendar Month, commencing on and from the time day of her delivery, as aforesaid, and at and after the same
73. rate for any part of a day month; hire to continue until the time hour of the day of her re-delivery GMT to apply both
74. ends in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost)
75. at ... on ....................................
76. ....................................
77. dropping last outward Sea Pilot and safe port
78. Aden / Japan range (in case of Persian Gulf, to be passing Muscat outbound) including Indonesia, Thailand,
79. PRC, Philippines,
80. Bassien / Bahia Blanca range (including Caribbean /North Coast South America / USG),
81. Vancouver / Valparaiso range,
82. Skaw / Cape Passero range (including Mediterranean Sea / Black Sea),
83. Cape Town / Mombasa range
84. port in Charterers' option, at any time day or night, Sundays and holidays included within 15th January 2010 and
85. 25th February 2010....................................
86. ....................................
87. unless otherwise mutually agreed. Charterers are to give Owners not less than...30 ...days followed by 20/15/10/7
88. days notice of approximate redelivery date and intended port thereafter 5/3/2/1 days definite notice of redelivery
89. date and port notice of vessels expected date of redelivery and probable port.
90.   5. Payment of said hire to be made as per Clause 61 in New York in cash to Owners' nominated account in
91. United States Currency, semi-monthly every 15 days in advance, and for the last half month or part of same the
92. approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day,
93. as it becomes due, if so required by Owners, unless bank guarantee or deposit is made for the estimated time. Time to count
94. falling the punctual upto expected redelivery time/date and regular payment of the hire, or bank guarantee or deposit,
95. or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the
96. Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count
97. from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or
98. their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time
99. used to count as hire.
100.   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, and/or
101. Owners by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from
   the hire. The Charterers, however, shall in no way be responsible for the application of such advances.
   6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or place in safe
   port or elsewhere or safe place in safe port or elsewhere that Charterers or their Agents may direct, provided the

2

vessel can safely lie always afloat at any time of tide, *NAABSA to apply at Argentina/Brazil/Colombia.* *See Clause 39* ~~except at such places~~ *provided* where it is customary for similar size vessels to safely lie aground.

7. That the whole reach of the vessel's Holds, Decks, and usual places of loading (not more than she can reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners……per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards *vessel's* employment and agency ; and Charterers are to load, stow, and trim, *secure tally and discharge and lash/unlash and dunnage* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, *strictly* in conformity with Mate's or Tally Clerk's receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his own risk and standard L.O.I to be signed and lodged with Master on his boarding* and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free *and suitable* accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of ~~$1.00~~ *$10.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying *USD 5.00* ~~at the current rate~~ per meal, for all such victualling *all charges for bonded stores consumed to be paid extra by Charterers at actual costs as billed by Master.*

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs *deck and engine Logs in English*, showing the course of the vessel and distance run and the consumption of fuel.

12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation only.*

13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~……………………………………………………………………………………………………………………………………… ~~on giving written notice thereof to the Owners or their Agents~~ …………… ~~days previous to the expiration of the first-named term, or any declared option.~~

14. That if required by Charterers, time not to commence before… *31st of December 2008*…….and should vessel not have ~~given written notice of readiness~~ *been delivered* on or before……………………………………………… …..*15th March, 2009* ……~~but not later than 4 p.m.~~ Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners to give 25/20 days vessel's full itinerary and Owners to give 14 days approximate notice of delivery and to narrow laycan in 10 days spread.* …………*See Clause 60.*

15. That in the event of the loss of time from deficiency, *and/or default of Officers /crew or deficiency* of men or stores, fire, breakdown or damages to hull, and machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom or by any other cause *whatsoever for which Owners are found liable under terms of this Charter Party and unless caused by Charterers* preventing the full working of the vessel, the payment of hire shall cease for the *actual* time thereby lost.; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the *actual* time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra *direct related* expenses shall be deducted from the hire.

16. That should the vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. That act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to *Arbitration in London as per Clause 48* ~~three persons at New York, one to be appointed by each of the parties hereto and the third by the two so chosen ; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~

159. *LMAA for claims not exceeding the amount of USD 50,000.*
160.     18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due
161. under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all
162. monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers
163. will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might
164. have priority over the title and interest of the Owners in the vessel.
165.     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and
166. Charterers' expenses and crew's proportion. General Average shall be adjusted, stated, and settled, according to
167. ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rules F of~~ York-Antwerp Rules 1924 *1994 or any subsequent*
168. *modification thereof*, in London unless another place is agreed in the Charter. Cargo's contribution to General
169. *Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master,*
170. ~~Pilot or Crew, at each port or place in the United States or may be selected by the carrier, and as to measure not~~
171. ~~provided for by these Rules according to the laws and usages at the port of New York. In such adjustment~~
172. ~~disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates~~
173. ~~made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the~~
174. ~~last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement~~
175. ~~or bond and such additional security as may be required by the carrier, must be furnished before delivery of the~~
176. ~~goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution~~
177. ~~of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shipper,~~
178. ~~consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be~~
179. ~~payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a~~
180. ~~special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and~~
181. ~~refunds or credit balances, if any, shall be paid in United States money.~~
182.     ~~In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting~~
183. ~~from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier~~
184. ~~is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally,~~
185. ~~shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general~~
186. ~~average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
187. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same~~
188. ~~manner as if such salving ship or ships belonged to strangers.~~
189. *It is understood that the charter hire is not to be contributed to General Average.*
190.     ~~Provisions as to General Average in accordance with the above, are to be included in all bills of lading issued~~
191. ~~hereunder.~~
192.     20. Fuel used by the vessel while at off-hire, also for cooking, condensing water, or for grates and stoves to be
193. agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.
194.     21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter,~~
195. ~~Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think~~
196. ~~necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be~~
197. ~~suspended until she is again in proper state for the service.~~
198. ~~No day dock during the currency of this charter unless in case of emergency or if when mutually agreed between~~
199. ~~Owners and Charterers~~ ~~~~ see Cl. 93 ~~~~
200.     22. Owners shall maintain the gear of the ship as fixed, providing gear (for all cranes and power derricks)
201. capable of handling lifts up to its *in accordance with description clause three tons*, also providing ropes, falls, slings
202. and blocks *as onboard*. If vessel is fitted with cranes derricks capable of handling heavier lifts, Owners are to
203. provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.
204. Owners also to provide on the vessel *sufficient lights as* on board lanterns and oil for night work, and vessel to give
205. ~~use of electric light when so fixed, but any additional lights over those on board to be at Charterers' expense.~~ The
206. Charterers to have the use of any gear on board the vessel.
207.     23. ~~Vessel to work night and day if required by Charterers, and all winches to be at Charterers' disposal during~~
208. ~~loading and discharging intense to provide one winchman per hatch in work winches day and night as required,~~
209. ~~Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in~~
210. ~~accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions,~~
211. ~~prevent crew from driving winches, then Winchmen to be paid by Charterers. In the event of a disabled winch or~~
212. ~~winches, or insufficient power to operate winches, Owners to pay for there engine, or engines, in lieu thereof, if~~
213. ~~required, and any any loss of time occasioned thereby.~~
214.     24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions~~
215. ~~from liability contained in the Act of Congress of the United States approved on the 13th day of February, 1893, and~~
216. ~~entitled "An Act relating to Navigation of Vessels, etc." in respect of all cargo shipped under this charter to or from~~
217. ~~the United States of America. It is further subject to the following clauses, both of which are to be included in all~~
218. ~~bills of lading issued hereunder:~~

4/5

**4**

219.
220. ~~U.S.A. Clause Paramount~~
221. ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United~~
222. ~~States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained~~
223. ~~shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its~~
224. ~~responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any~~
225. ~~extent, such term shall be void to that extent, but no further.~~

~~Both-to-Blame Collision Clause~~
226. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act,~~
227. ~~neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the~~
228. ~~management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or~~
229. ~~liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or~~
230. ~~damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying~~
231. ~~ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying~~
232. ~~ship or her owners as part of their claim against the carrying ship or carrier.~~

233. **25.** The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have
234. been or are about to be with-drawn by reason of ice, or where there is risk that in the ordinary course of things the
235. vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or
236. discharging.

237. **26.** Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to
238. remain responsible for the navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters,
239. same as when trading for their own account.

240. **27.** A commission of *1.25* ........ per cent is payable to the Vessel and Owners to
241. ...........*P.K. KAKOULIDIS SHIPPING CO LTD*........
242. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

243. **28.** An address commission of *2.5 3-1/2* per cent payable to.... *Charterers* .....on the hire earned and paid
244. under this Charter.

*Additional Rider Clauses 29 to 95, to be deemed part of and incorporated in this Charter Party.*

Owners                                    Charterers

5/5

5

### RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
### M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
### TRANSPORTATION

**Clause 29 – Shore Watchmen**
Shore watchman or watchmen to be for Owners' account if requested only by Owners/Master. However, if such shore watchman (men) to be used or employed by reason of cargo, or if required by port authorities, then cost of shore watchman (men) to be for Charterers' account. Compulsory watchman (men) to be for Charterers' account. Shore watchman (men) and/or gangway watchman (men) in calling U.S.A Ports shall always to be for Charterers' account.

**Clause 30**
All negotiations and eventual fixture to be kept private and confidential.

**Clause 31 – Certificates / Vaccinations**
Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates and approvals and equipment and fittings, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party and bunker within the trading limits of this Charter Party.

It is the responsibility of the Master and the Owners to arrange for any vaccination required at ports of call and to keep on board corresponding valid certificates, failing this, any time lost and all extra expenses to be for Owners' account, and may be deducted from the hire.

**Clause 32 – Tonnage certificates**
Upon delivery, the vessel shall have on board tonnage certificate, valid for the duration of this Charter Party, and such tonnage certificate shall comply with current requirements of ports of call within the trading limits of this Charter Party.

**Clause 33 – ITF / Flag Restrictions**
Owners warrant that the Officers and crew of the vessel are covered for the duration of this Charter Party by an I.T.F. agreement acceptable world wide within trading limits or equivalent agreement. Loss of time as a result of non-compliance shall be considered as off-hire.

In the event of loss of time, delay of impossibility of or restriction on the full working of the vessel resulting from any action that may be taken against the ship by third party on grounds due to or connected with the country of registration of the ship, the flag flown by the ship, and the condition upon which the crew of the ship is engaged and employed by the Owners the Owners are to remain responsible for the above mentioned action, loss of time, delay or impossibility of or restriction of working and any time loss consequently upon the above mentioned action by third parties, shall be considered as off-hire and to be deducted from the hire, and any extra expenses resulting directly from such action shall be payable and paid for by the Owners, or in Charterers' option, shall be deducted from the hire.

Owners warrant that the vessel, to the best of their knowledge, is not blacklisted by any country within the trading limits of this Charter Party, on the date of this Charter Party.

1/27

6

RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION

Clause 34 – Oil Pollution
Financial responsibility in respect of pollution

(1) Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates ;

Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the charter), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2) Notwithstanding anything whether printed or typed herein to the contrary,

(a) save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bill of Lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(3) Charterers warrant that the terms of this clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

Clause 35 – P N I Club / Cargo Claims
Owners confirm that the vessel is fully covered for the duration of Charterers' employment by "JAPAN P N I" and Charterers confirm that the vessel will be entered in "........................." for Time Charterers' Liability Insurance throughout this charter period.

Any liability to third parties for cargo claims shall be borne by Owners/Time Charterers in accordance with the Inter-club N.Y.P.E. Agreement as amended May 1984 and any subsequent amendments thereto.

Clause 36 – Liability Insurance
The Charterers shall not be responsible for loss of life, nor personal injury, nor arrest or seizure or loss or damage to the vessel and/or other objects arising from perils insured against by customary policies of insurance, unless caused by the neglect or default of the Charterers and/or their servants and/or their agents.

2/27

7

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

**Clause 37 – Lay-Up / return insurance**
The Charterers shall have the right to order the lay-up of the vessel at any time and for any period of time, at a safe berth or anchorage, and in the event of any such lay-up, the Owners shall promptly take steps to effect all the economies in operation costs, including insurance, which may be possible and give one month notice on any credit to Charterers in respect of all such economies. At the request of the Charterers, the Owners shall, at any time, furnish an estimate of the economies which would be possible in the event of a lay-up of the vessel. The Charterers to have the benefit of any return insurance premium received by the Owners from their Underwriters if any as long as rules permitted, as and when received by reason of the vessel being in port for minimum thirty (30) days, provided the vessel is on hire.

**Clause 38 – Bottom Cleaning**
If the vessel is in a port for more than 30 days or idle at a safe anchorage for more than 30 days, Owners to appoint divers to check hull bottom and report with signature to Charterers. If Charterers need hull bottom cleaning at their discretion, Charterers are to bear the cost of hull bottom cleaning. Owners shall endeavour to carry out bottom cleaning at next available port where such facilities are available. Vessel is to remain on-hire during the cleaning operation. However, when practical, the bottom cleaning should take place at the port where the ship has been laying for more than 30 days, but if it is not practical to do so and cleaning has to take place at another location, Charterers have no right to lodge a speed or bunker claim against the Owners during the period the vessel is in a fouled condition and enroute to the port identified where the hull cleaning is to be undertaken.

**Clause 39 – NAABSA**
Charterers have the option to trade vessel in Argentina/Brazil/Colombia where vessels of similar size customarily lie and safely aground. Owners have option to arrange inspection of vessel's bottom and underwater parts by diver and/or class surveyor at a convenient port if vessel has touched bottom at the NAABSA port. If any damage is found to vessel's bottom or underwater part, any extra time incurred and expenses for such inspection shall be for Charterers' account. If no damage is found to vessel's bottom or underwater part, any extra time incurred and expenses for such inspection shall be equally shared between Owners and Charterers.

**Clause 40 – Trading Exclusions**
Trading to be world wide between safe port(s), safe berth(s) and safe anchorage(s) and places, always safely afloat, always within Institute Warranty Limits, always within war risk trading warranties and excluding war and warlike zones which declared by Owners' war risk Underwriters from time to time and countries which time to time may be excluded by governing authority of the vessel's flag, and always excluding the following countries :-

Nicaragua, El Salvador, Honduras, Haiti, Cuba, Orinoco river and Magdalena river in Venezuela, Angola including Cabinda, Eritrea, Somalia, Nigeria, Guinea, Tunisia, Libya(including Gulf of Sidra/Sirte), Zaire, Liberia, Etiopia, Sierra Leone, Namibia, Israel, Turkish occupied Cyprus, Lebanon, Syria, Iraq, Yemen (North and South), former Yugoslavia but Slovenia and Croatia allowed, Albania, Serbia, Montenegro, Georgia including Abkhazia, Russia Pacific Ports(C.I.S Pacific Ports), Ports where threat of "Asian Gipsy Moth Exists but always excluded Japanese ports", North Korea, Papua, Laos, Burma, Scandinavia (Norway/Sweden/Finland/Denmark) Bangladesh, Sri Lanka but Colombo allowed, Sudan, Vanino, Alaska, Cambodia, Great Lakes, Any area(s) and/or countries banned and boycotted by the U.N and/or USA and/or EU embargoed.

No direct trading between China and Taiwan or visa versa.

No Indian coastal trade or consecutive voyages with aggregates.

Vessel not to trade in ice.

3/27

8

RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION

**Clause 41 – Cargo Exclusions**
Vessel can be employed in carrying lawful merchandise cargoes but always excluding cargoes restricted by as follows:-

Antiques, art objects and curios, Ashes, Automobiles or cars or trucks or lorries or any other vehicles, Banknotes or other forms of currency, Bonds or other negotiable instruments, Bullion, Calcium nitrate, Calcium oxychloride, Corrosives, Stones or other objects of a rare or precious nature, Stone blocks, Livestock, Injurious and/or inflammable and/or dangerous goods, Listed cargo in the IMO blue books (IMDG code), Arms, Arms and war materials, Ammunitions, Nuclear materials and waste, Radio isotopes, Radioactive materials and wastes, Explosives, Black powders, Blasting caps, Detonators, Bombs, Dynamite, TNT, Hazardous cargoes, Hides, Coffee, Cocoa, Niger seeds, Seed cakes, Manioc and manioc pellets, Copra, Copra products, Sunflowers seed expellers, Oil cakes, Mazoya expellers, Mazoya pellets, Cotton, Quebracho, Pyrites, Granite, Asbestos, Zinc, Charcoal, Pond coal, Indian coals, Indian coke, Sludge ore, Chrome ore, Pitch in bulk (incl. Pencil pitch), Bauxite, Ferro silicon, Concocatatos incl iron ore (incl. iron pellets, Sponge iron, Direct reduced iron ore and its products, Pig iron, Hot briquetted iron(HBI), Hot moulded briquettes, Ammonia, Ammonium nitrate, Ammonium sulphate except fertilizer grade, Calcium hypochlorite, Calcium carbide, Sodium sulphate in bulk, Harmful and corrosive fertilizers, Chilean nitrate, Soda ash, Potash in bulk, Ashes, Creosoted goods, Acids, Technical urea, Resin, Caustic soda, Borax, Clay, Bagged cargoes incl Bag rice, Fishmeal, Salt, Sulphur, Petcoke, Cement clinker, Bulk cement, Lime, Salt cake, Slurry, Turpentine, Any kind of Sand, Any kind of Log, Naphta, Tar and its products, Petroleum and its products, Asphalt, Bitumen, Milled rice, Mobile homes, Motor vehicles, Yachts, Bones and bone meals, Containers, Metal borings and cuttings, Motor spirits, Any kind of Scrap including motor blocks and turnings, Any cargoes embargoed by the United Nations.

Bulk cargoes listed in the IMO code of safe practice for solid bulk cargoes 1998 which can not be certified by Charterers/Shippers as harmless and/or having a history of shipment without problems. Charterers undertake to load vessel in accordance with IMO code of safe practice for solid bulk cargoes 1998 also in accordance with any local regulations. All cargoes (especially concentrate and coal) to be loaded, stowed, carried and discharged strictly in accordance with IMO code of safe practice for solid bulk cargoes 1998 and local regulations.

The vessel is not allowed to sail with any hold loaded to less than 10% of the hold's maximum allowable cargo weight when in the full load condition.

The vessel is prohibited from carrying bulk cargoes with bulk density of 1,780 kg/m3 and above.

Irrespective of what is mentioned above, Charterers are allowed to carry max 5 cargoes total per annual of the following commodities :-

1) Max 2 cargoes of Salt
2) Max 2 cargoes of Sulphur
3) Max 2 cargoes of Petcoke
4) Max 2 cargoes of Shredded scrap only and/or HMS 1+2
5) Max 2 cargoes of Bulk Cement
6) Max 2 cargoes of Cement clinker
7) Max 2 cargoes of Ammonium Sulphate (Fertilizer grade only)

Charterers not to carry above Salt / Sulphur / Petcoke / Scrap / Bulk Cement / Cement clinker / Ammonium Sulphate cargoes on consecutive voyage and none of the above cargoes to be carried as last 2 (two) voyage prior to redelivery.

4/27

9

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION**

Clause 41 – Cargo Exclusions – continued
Pet Coke Loading :-
Petroleum coke mentioned herein is only limited to the type of non-hazardous/non oily/non dangerous green delayed and/or calcined type (needle/uncalcined always excluded). If Charterers exercise such option, Charterers endeavour to use the lowest holds possible, provided vessel's stability trim and stres permits. Such cargo to be loaded/stowed/trimmed/discharged strictly in accordance with the latest IMO and/or any other latest regulations/rules applicable to such cargo.

After discharge Charterers to arrange at their expense/time for any additional/special wash down of holds carrying such cargo by chemicals upto entire satisfaction of Owners/Master that all oily residues has been removed. Any additional chemicals/fresh water be required by Master to be for Charterers' account.

Sulphur/Salt loading : Charterers undertake to use holds as less as possible provided vessel's stability trim, stress permitting and not first cargo from delivery subject the following limewash clause:

Charterers to arrange lime washing the vessel's cargo holds at their time, risk and expenses prior loading, also to wash down cargo holds with fresh water after completion of discharge so that cleaning of cargo holds/removal of all cargo residues and limes upto entire satisfaction of Owners/Master at Charterers' time, risk and expenses. Should any chemicals/additional fresh water be required by Master for cleaning holds after discharging, same to be arranged by Charterers at Charterers' time, risk and expenses. After discharging of such cargo, the Charterers are responsible for cargo holds and the vessel's other parts or facilities (as may be required due to the carriage of such cargo) being water washed and cleaned upto Owners'/Master's satisfaction, all at the Charterers's time, risk and expenses.

Scrap loading: Charterers are permitted to carry max 2 (two) cargoes of shredded-scrap-only shredded scrap and/or HMS 1+2 during this period but always-excluded HMS 1+2, motor-blocks-and-turnings. No needle / painted scrap to be loaded which will puncture the tank top. Charterers to arrange cleaning of cargo holds after completion of discharge upto entire satisfaction of Owners/Master that all residue has been removed. Should any chemicals/additional fresh water be required by Master for cleaning holds after discharging, same to be arranged by Charterers at Charterers' time, risk and expenses

Cargo to be loaded as per following scrap/soft loading clauses :-

Scrap to be non-oily, harmless and to be carried in accordance with fully updated IMO code of safe pratice for solid bulk cargoes (as amended) and other applicable code. Charterers to load scrap cargo slowly and as close as possible to tank top into hold to Master's satisfaction so as not to cause any damage on longitudinal bulkheads, tanktop, side tanks, etc. Loading into vessel upto 2 (two) metres height with Master's satisfaction which not to be unreasonable withheld, shall not be turned by chutes and cargo shall be carefully layered onto the entire hold bottom prior commencing of any dumping as customary at load port. Master has the right to stop loading should stevedores/other loading personnels fail to comply with above and/or endanger the vessel and/or her equipments/fittings at any stage of loading.

**10**

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION**

Clause 41 – Cargo Exclusions - continued
Additional clauses (A to E) to apply if scrap is loaded:-

A. A joint survey to be held regarding vessel's hold condition before the commencement of scrap cargo loading with time/cost of same being for Charterers' account

B. A further joint survey to be held after completion of discharge of scrap at final discharge port stating what damage, if any, has been caused to vessel with time/cost of same being for Charterers' account.

C. If stevedore damage is ascertained by the survey reports then Charterers are to repair such damage at final discharge port without any delay upto entire satisfaction of Owners/Master at Charterers' time, risk and expenses.

D. This clause does not relieve Charterers from liability for hidden damages caused by stevedores.

E. Charterers to give Owners adequate notice of their intention to load scrap cargo so that they may appoint surveyor as per (A).

Cement loading : Charterers undertake to use holds as less as possible provided vessel's stability trim, stress permitting and not first cargo from delivery. Charterers to arrange cleaning of cargo holds, responsible and to pay for through washing down of all holds immediately after discharge to keep holds paint in good condition upto entire satisfaction of Master/Owners that all residue has been removed. Should any chemicals/additional fresh waters be required by Master for cleaning holds after discharging, same to be arranged by Charterers at Charterers' time, risk and expenses.

Charterers have the option to cut holes on hatch covers for loading bulk cement on following conditions:-

1. Well production to bilge wells of all holds is strictly necessary to keep smooth suction while discharge hold washing water, by using gum tapes (plasters) or so.

2. Charterers to indemnify Owners of all possible cargo solidification due to hold sweating which if it is impossible to avoid by proper operation of existing natural ventilation system.

3. All cutting and restoring of the holes to be fully supervised/attended/approved by vessel's classification surveyor with written document.

4. Holes not to be cut within the same frame space with the existing grain feeding holes if any and to be cut at the suitable place of hatchcover in accordance with vessel's builder specification. When restoring cement holes, chill plates or similar material deemed necessary by Master/surveyor to be fitted for complete welding in order to reinstate the hatchcovers back to their original condition.

5. After completion of restoring holes, Owners' option to have hose test and ultra sonic test for leaking point carried out in presence with vessel's classification surveyor and test result should be upto his satisfaction. Otherwise have obligation to rectify the situation until and when satisfied by the vessel's classification surveyors.

6. During hose test carried out if water ingress into cargo holds and cargo damaged, all cost for damage, time and cost relate will put into Charterers' account.

7. All time for preparing cutting, restoring, testing upto classification surveyors' satisfaction as well as expense including classification surveyors' fee and expenses shall be for Charterers' account.

8. Additional materials request and required by Master and classification surveyor for sealing welding seams of cement holes are into Charterers' account

9. Charterers to provide drawings and/or welding procedure to vessel's classification surveyor for verify and approval prior commence cutting.

# RIDER CLAUSES TO CHARTER PARTY DATED 7th May, 2008
## M/V "JOANTHI" / ACC MAXVEL INTERNATIONAL MANAGEMENT AND TRANSPORTATION

**Clause 41 – Cargo Exclusions – continued**

10. If at tend port discharging port for conduct cutting and restoring vessel holes are not accepted for hose testing in port as per port regulation, Charterers to take full responsibility to shift the vessel into safe place and always affect and at Charterers' risk for conduct cutting or restoring vessel holes as per 9. All time lost and expenses are to be for Charterers' account.

For carrying for safe/unsafe/perishable/non/unharmy cargo, Charterers require assistance of crew between legs, Charterers to pay crew special bonus which to be agreed between Charterers and Master directly; thus, Owners/Master are not responsible if Charterers/Receiver cannot reach an agreement on details of above assistance. All necessary materials, tools and equipments required to be for Charterers' time, risk and expenses. Owners/Vessel will not be responsible for the conditions of holds condition/passing subsequent and fitness/passed however, Charterers to be supplied by Charterers in accordance with Master's requirements.

Steel cargo: Steel cargo to be sufficiently dunnaged, lashed, secured and unlashed/unsecured at Charterers' risk, time and expenses under the supervision of Master and to his satisfaction. If loading steel and steel products, Owners will have option to conduct pre-loading survey and out/turn survey through their P & I Club surveyor at Charterers' time, risk, expenses and the costs to be equally shared between Owners and Charterers and vessel to remain on hire. Surveyor's remarks if any related to cargo to be endorsed in Mates' receipt and Bills of Lading.

Deck cargo: time, risk and expenses to be for Charterers' account and always subject to vessel's deck strength/ability and Master's direction and Charterers to supply any and for all lashing/unsecuring and fitting etc. required by Master. Charterers to indemnify Owners and remain accountable for any damage caused to vessel, its crew and/or any other person and/or any property due to loading of such cargoes on deck. Bills of Lading for deck cargo to be claused "shipped on deck" on Charterers', Shippers' and Receivers' risk, expenses and responsibility without liability on the part of the vessel or her Owners for any damage/expenses or delay howsoever caused.

Charterers/Charterers warrant cargo non corrosive and non harmful.

Subject to the limitation of IMO cargo exclusion for and before loading concentrates, all necessary separation to be properly erected upto Surveyors' and Master's satisfaction which can not be unreasonably withhold, at Charterers' time and expenses and cargo to be loaded, stowed, separated, discharged, trimmed etc. upto IMO and board trade regulations. Charterers allow Owners to appoint their P and I Surveyor or independent Surveyor at Charterers' expenses to supervise loading at Charterers' risk, execution of separation, etc. to Surveyor's agreement and Master's satisfaction at Charterers' risk, time and expenses.

Before loading concentrates, Charterers to supply vessel with Shippers' certificate of flow moisture content evidencing cargoes compliance with IMO regulations. After loading, cargo must be properly trimmed at Charterers' risk, time and expenses to Surveyor's and Master's satisfaction. That sample should be established as true representative of the consignment prior to loading by Surveyor agreed by Owners and Charterers at Charterers' expenses. Surveyors cost to be paid directly by Charterers. Separations required for different parcels of cargo to be supplied to the ship and erected in the holds at Charterers' risk, time and expenses.

Charterers are not to carry concentrates as the last 2 (two) shipments prior to vessel's redelivery.

RIDER CLAUSES TO CHARTER PARTY DATED 7ᵗʰ May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION

**Clause 42 – Master / Crew Assistance**
Vessel to work day and night if required by the Charterers, and all gears to be at the Charterers'
disposal during loading and discharging. Hire stipulated herein to include the following services:-

1. Clearing of cranes from stowage in preparation for loading and/or discharging.
2. First opening and last closing of hatches in preparation for loading and discharging.
3. Supervision of loading and/or discharging.
4. Maintaining power while loading and/or discharging, and care of cranes.
5. Shifting ship during loading and/or discharging, and shifting between berths.
6. Docking and undocking.
7. Bunkering.
8. Subject weather condition and local labour/port regulation permitting, Officers and crew to
   shape up the ship's hatches and gear as much as possible prior to arrival at loading and/or
   discharging ports, docks and/or places so as to immediately commence loading and/or
   discharging operations.

If the rules of the port or labour unions prevent crew from opening and closing hatches, shore labour
to be paid by the Charterers. In the event of a disabled winch or winches, Owners to pay for shore
engine or engines in lieu thereof if required.

The vessel's Officers and crew shall perform extra work if so requested by the Charterers, such as
cleaning holds, setting stanchions, lashing and relashing or unlashing of cargo or collecting and
providing of dunnages and/or lashing materials including catwalks, cargo marks, painting and etc.,
providing and subject that shore and labour union's regulation permit/allow: Charterers to pay crew
special bonus which agreed with an amount with Master/crew directly per voyage. Thus, Owners are
not to be responsible for the result of such extra works done by the crew as per request of Charterers.

Although the Owners/Master shall not be responsible for all gear, equipment, and/or stores supplied to
the vessel by or for Charterers' account, the Master shall keep a record of all such gear, equipment
and/or stores so supplied and to maintain same in normal condition wear and tear except. Such gear,
equipment, and/or stores to be redelivered to the Charterers prior to redelivery of the vessel to the
Owners, or if required by the Charterers, at any time during the charter, unless consumed.

**Clause 43 – Weather Routing**
i)   The vessel shall, unless otherwise instructed by the Charterers, proceed by the customary
     route, but the Master may deviate from the route if he has reasonable grounds to believe that
     such a route will compromise the safe navigation of the vessel.

ii)  In the event the Charterers supply the Master with weather routing information, although not
     obliged to follow such routing information, the Master shall comply with the reporting
     procedure of that service.

**Clause 44 – Supercargoes / Port Captains**
At any stage of this Charter Party, the Charterers and/or their Supercargoes, and in the presence of
vessel's Master and /or Engineers and/or Officers, shall have free access in Charterers' time and
expense to the whole vessel, including bridge, holds and bunker tanks, provided no interference with
vessel's normal operations.

Whenever required by the Charterers and/or their Supercargoes and/or their Surveyors, the Master
shall endeavour to bring the vessel into even trim to ensure correct bunker soundings.

8/27

**13**

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION**

**Clause 45 – Performance**
If the Charterers have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

**Clause 46 – Stevedore Damage**
Should any damages be caused to the vessel or her fittings by the Charterers or their stevedores, the Master and/or the Owners shall do the following:

1. Give written notice to the Charterers or their supercargo, or their agents, of full particulars of the damage caused, and the party allegedly responsible for the damage. Such notice to be given not later than 24(twenty-four) hours after the damage has occurred or prior to the vessel's sailing from the port. For stevedore damage not visible when carrying scrap or steel, such notices to be given not later than on completion of discharging of cargo.

2. Give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause, and endeavour to obtain the written acknowledgement of liability from such party, or failing that, Master/vessel has to obtain the acknowledgement of receipt of such notice. Such notice to be given not later than 24(twenty-four) hours after the alleged damage occurs and, in any event, prior to the vessel's sailing from the port. For stevedore damage not visible when carrying scrap or steel, such notices to be given not later than on completion of discharge of cargo.

3. Immediately arrange in conjunction with Charterers' agents or supercargo the damage to be surveyed and an estimate of the repair costs given.

It is expressly agreed and understood by Owners that the purpose of compliance of Owners' and Master's obligations in this clause is to preserve the Charterers' right of recourse against the party allegedly responsible, and if the Owners and/or Master fail to comply with their obligations under this clause, the Charterers shall not be responsible to Owners for any such damage.

The Charterers shall have the liberty to redeliver the vessel without repairing the damage for which the Charterers are responsible as long as the damage does not affect the vessel's seaworthiness or the proper working of the vessel and/or her equipment but the Charterers undertake to reimburse costs of repair against production of repair bills by repairers or dockyard unless otherwise agreed. Any stevedore damage affecting the vessel's seaworthiness or the proper working of the vessel and/or her equipment, shall be repaired without delay to the vessel after each occurrence in the Charterers' time, risk and shall be paid for by the Charterers before sailing from the port.

**Clause 47 – Off-Hire**
Deviation and/or delay because of sickness of the crew, shall be considered as off-hire, and all extra expenses in this connection shall be for Owners' account, and shall be deducted from the hire.

After suspension of hire, from any cause, the vessel shall be placed again at Charterers' disposal at the same port or place or equidistant position where hire was suspended.

The Charterers may in their option, at any time add to the Time Charter period partly or wholly any off-hire period(s). The rate of hire for any such added period(s) shall be calculated and paid at the same rate as applicable during the off-hire period(s).

During any off-hire period estimated to exceed eight(8) days, the Owners to give the Charterers not less than five(5) days approximate and three(3) days definite notice of resumption of the service.

9/27

14

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

**Clause 48 – Arbitration**
Arbitration in London and English law to apply.

All disputes arising out of this contract which cannot be amicably resolved shall be referred to Arbitration in London.

Arbitrator to be appointed by each party, the reference shall be to two Arbitrators. But if one party failing to appoint Arbitrator within 14 days after another party has appointed one, then it will become sole Arbitrator for the Arbitration. The Arbitrators and the umpire, if appointed, shall be the commercial men conversant with shipping knowledge, and the members of the London Maritime Arbitrators' Association or otherwise qualified by experience to deal with shipping disputes.

The contract is governed by English law and there shall apply to Arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the Arbitration proceedings are commenced.

**Clause 49 – Freshwater**
Freshwater is always for Owners' account, unless the freshwater is to be used by the special request from the Charterers, in which case Charterers' letter of instruction to Master will cover all use of such freshwater, if so required.

**Clause 50 – Mutual Cancellation**
Mutual cancellation: Between any of the following countries, U.S.A, Nation of vessel's flag, Great Britain, C.I.S, People's Republic of China, becoming engaged as an actual participant in a war or war-like operation in which one or more of the above named countries directly affecting due fulfillment of this contract, Charterers and/or Owners shall have the right to cancel this Charter Party without liabilities.

Such cancellation should take place at the port of destination after discharging cargo on board subject to the provisions of the attached chamber of shipping and war risk clauses. It is understood that the war or actual hostilities means direct war or hostilities or civil war, where any of the above countries support opposing sides.

**Clause 51 – Itinerary and Agents**
Charterers will endeavour to keep Owners advised of vessel's itinerary and their agents name at each port to enable Owners to forward crew mails, arrange store, cash advances and other Owners' husbanding matters.

**Clause 52 – Grain Fitted**
Vessel is fitted for carriage of grain in accordance with chapter VI of Solas 1974 and amendments, without requiring bagging, strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk (stowage factor 42 CBFT) with ends untrimmed.

10/27

**15**

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

**Clause 53 – Vessel's Description**

**MV IOANTHI (EX SUNOR)**

SDBC BLT 1992
DWAT 42,001 MT ON 11.228M SSW
KOREA FLAG KR CLASS IMO NO. 9003184
FNTL GRT/NRT  23,272/13,681
SUEZ GRT/NRT  24,191/21,508
PANAMA GRT/NRT  23,409/17,995
LOA/BEAM 179.99/30.50 M
5/5 HO/HA HATCH DIMS N1 14.40 X 15.30 N 2/3/4/5 19.20 X 15.30 M
MACGREGOR HYDRAULIC END FOLDING TYPE HCVRS
IHI ELECTRO-HYDRAULIC DECK CRANES
MARK II H25024-120
4 X 25 MT, OUTREACH 24 METERS
IF GRABS ATTACHED TO CRANES THEN THE WEIGHT OF GRAB AND CARGO NOT TO EXCEED
80% OF THE DESCRIBED SAFE WORKING LOAD OF CRANES UNDER NORMAL DUTY CYCLE OF
CRANE OPERATION.
4 (FOUR) GRTZ ELECTRO-HYDRAULIC GRABS
   A.  CAPACITY ABT 7-9 M3 AND DENSITY ABT 1.2 MT/M3
   B.  COO WITH DENSITY TO 1.2 MT/M3, NO KICK PLATE HAD TO BE REMOVED AND
      CAPACITY ABT 9 M3 / COO WITH DENSITY FM 1.2 TO 1.6 MT/M3, HAVE TO REMOVES THE
      KICK PLATES AND CAPACITY ABT 7 M3
   C.  GRABS ARE NOT TO BE USED BY CHRTRS UNLESS OTHERWISE AGREED
GRAIN/BALE 52,125/49,832 M3
SPEED/CONSUMPTIONS :-
BALLAST ABT 13.5 KNOTS ON ABT 23.5 MT IFO 380 CST + ABT 0.5 MT DIESEL
LADEN  ABT 13.0 KNOTS ON ABT 25.0 MT IFO 380 CST + ABT 0.3 MT DIESEL
IN PORT IDLE    ABT 2 MT IFO + ABT 0.1 MT DIESEL
IN PORT FULL GEAR  ABT 1 MT IFO + ABT 2.5 MT DIESEL
SPEED/CONSUMPTIONS UNDER GOOD WEATHER CONDITIONS UPTO BEAUFORT SCALE 4 AND
DOUGLAS SEA STATE 3, NO ADVERSE CURRENT. VESSEL CONSUMES DO IN M/E WHEN
MANOEUVRING IN NARROW AND CONFINED WATERS, IN/OUT OF PORT, CHANNELS, RIVERS
AND TRANSITING CANALS.
DISTANCE FROM WATER LINE TO TOP HATCH-COAMING HEAVY BALLASTED ;
  H1 : 11.10 M - H3 : 10.85 M - H5 : 10.70 M
HOLD CUBICS BDOWN GRAIN / BALE ;
  NO  1    8,830  /  8,470
         2   11,344  /  10,817
         3   10,789  /  10,314
         4   11,340  /  10,786
         5    9,822  /  9,445  IN CBM

LUMBER CAPACITIES;
TOTAL LUMBER CAPACITY (HOLD + DECK) : 68,879 CBM
DECK LUMBER CAPACITY (1 METER ABOVE STANCHION LEVEL) : 17,649 CBM
TOTAL LUMBER DECK CARGO WEIGHT 9,369 MT

**RIDER CLAUSES TO CHARTER PARTY DATED 7ᵗʰ May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION**

Clause 53 – Vessel's Description - continued

TANK TOP STRENGTH;-
N1 HOLD    19.90 MT/M2
N2 HOLD    13.50 MT/M2
N3 HOLD    24.20 MT/M2
N4 HOLD    13.80 MT/M2
N5 HOLD    20.50 MT/M2
DECK (EXCL BETWEEN HATCH COVERS) STRENGTH 3.40 MT/M2
HATCH COVER STRENGTH - N1: 2.20, N2-5: 2.40 MT/M2
FLAT FLOOR DIMS :-

| HOLD | LENGTH | BREADTH | | |
|------|--------|------|-----|-----|
| | | FORE | MID | AFT |
| NO  1 | 26.3 | 4.8 | | 20.4 |
| 2 | 26.4 | 20.6 | | 22.6 |
| 3 | 26.2 | | 22.6 | |
| 4 | 26.4 | | 22.6 | |
| 5 | 25.6 | 22.2 | | 8.1 |

DRAFT AND DEADWEIGHT :-

| ITEM | | FREEBOARD (m) | DRAFT (m) | DWT (mt) |
|------|---|---------------|-----------|----------|
| TROPICAL FRESH | TF | 4.121 | 11.717 | 43,092 |
| FRESH | F | 4.354 | 11.484 | 42,004 |
| TROPICAL | T | 4.377 | 11.461 | 43,113 |
| SUMMER | S. | 4.610 | 11.228 | 42,001 |
| WINTER | W | 4.843 | 10.995 | 40,893 |

LIGHT SHIP DISPLACEMENT 6,753 MT
TPCM 47.6 MT FULL SUMMER MARKS
CO2 FITTED - AUSSIE/AHL FITTED
LOG FITTED BUT NO LASHING MATERIALS AS ONBOARD
FRESH WATER CAPS (TOTAL) 312 MT
BALLAST CAPS (LIGHT/HEAVY) 11,811/22,015 MT
BUNKER CAPS (96% FULL) IFO 1,497.2 MT/MDO 116.6 MT
THE BUNKERING PRODUCTS TO BE DELIVERED ALWAYS TO MEET ISO 8217:2005
INTERNATIONAL FUEL STANDARDS AND ANY SUBSEQUENT REVISION THEREOF.
RESIDUAL FUEL
FOR IFO 380 CST: COMPLYING WITH ISO 8217:2005(E) RMG 380
FOR DIESEL OIL : COMPLYING WITH ISO 8217:2005(E) DMB
BUNKERS TO COMPLY WITH MARPOL ANNEX VI
THE BUNKERS TO BE DELIVERED, MUST NOT CONTAIN WASTE LUBRICATING OIL, CHEMICAL
WASTE, OR ANY OTHER SUBSTANCES WHICH ARE NOT INHERENT TO BUNKERS.
SUBJECT VESSEL IS A MEMBER OF THE DET NORSKE VERITAS FUEL QUALITY PROGRAM.
CONSTANTS ABT 270 MT EXCL FW/LUBS/UNPUMPABLE

INMARSAT C      TELEX    444095771 / 444095772
NERA F33        PHONE    764570781 / 764570782
NERA F33        FAX      764570784
E-MAIL ADDRESS           DSOL9@globhosmail.com   (Globe Wireless Users Only)

(ALL DETAILS ABOUT AND WITHOUT GUARANTEE)

12/27

**17**

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

**Clause 53 – Vessel's Description - continued**

Owners confirm following :-

1. Vessel to be classified 100 +A1 at Lloyds or equivalent
2. Vessel to be single decker/bulk carrier/bridge and Eng. room is aft
3. Vessel to have on board the valid and sufficient calibration scales in order to perform draft survey through this Charter Party
4. Vessels' hatch covers are to be weather tight all through this Charter Period and if any hatch cover found defective, same to be rectified at Owners' time and expenses to the satisfaction of class surveyor
5. Vessel shall not change her class through this Charter Period without Charterers' written consent
6. Vessel will not be scheduled for break up or sold for scrap upon completion of this charter
7. Vessel is not black-listed in any port of call and ARAB league
8. Vessel has clear unobstructed main hold and is suitable for grab discharge in every respect and has on board a valid grain loading certificates
9. Vessel does not have a center line bulkhead and/or beam or any other obstruction

**Clause 54 –Speed and Consumption**
The Owners confirm that the vessel shall proceed with the utmost dispatch and shall be capable of performing the stated RPM at all times during the sea voyage, except when vessel encounters weather conditions of higher than Beaufort Scale four(4) and/or Douglas Sea State 3(three).

"Good weather conditions" and "about " means maximum Beaufort force 4 (four) and/or Douglas Sea State 3 (three) end plus/minus 5 (five) percent respectively. The Charterers may instruct the vessel to steam at any slow speed if practicable.

**Clause 55 – Deleted**

**Clause 56 – Quarantine**
Normal quarantine time and expenses for the vessel's entering port shall be for Charterers' account but any time of detention and expenses for quarantine due to pestilence, illness and etc. of Master, Officers and crew shall be for Owners' account.

**Clause 57 – Smuggling**
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers' supercargo, their staff and/or Charterers' agent, same to be for Owners' account if caused by Officers and/or crew and/or Owners' agent

**Clause 58 - Stowaways**
(a)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

**18**

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

Clause 58 - Stowaways - continued

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the vessel shall remain on hire.

(iii) Should the vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

(b)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the vessel shall be off hire.

(ii) Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

Clause 59 - Breakdown of Cranes
In the event of breakdown of cranes by reason of disablement or insufficient power or otherwise unless caused by Charterers or Charterers' servants, the hire to be reduced pro-rata for the period of such insufficiency in proportion to the number of cranes that were working at the time of breakdown of equipment.

If Charterers elect to continue work on hatch or hatches affected by breakdown by hiring shore appliance, Owners are to pay for shore appliances, but in such case Charterers are to pay full hire for all time shore appliances are working. Any stevedore and/or labour charges additionally accruing due to breakdown of vessel's equipment including costs for standby of stevedore and/or labour to be for Owners' account but maximum one shift

If Charterers hire shore crane, it must be approved by Owners.

Grabs are, if any, always at Charterers' disposal but at Charterers' risk only.
I.e. Charterers do not claim on grab problems, even if any.

Clause 60 – Lay/Can
Should the vessel not be delivered by the date of cancelling, the Charterers shall have the option of cancelling. If the vessel cannot be delivered by the cancelling date, the Charterers, if required, shall declare within 48 running hours after receiving notice thereof whether they cancel or will take delivery of the vessel.

14/27

**19**

**RIDER CLAUSES TO CHARTER PARTY DATED 7ᵗʰ May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

Clause 61 – Hire Payment

A) First 15 days hire and value of bunkers on delivery to be paid within 3 (Three) banking days after vessel's delivery. Charterers are entitled to deduct from last sufficient hire payments estimated Owners' disbursements, but maximum USD500.00 per port as well as estimated bunkers on redelivery value.

B) For hire calculation purpose, time on delivery / redelivery to be based on GMT.

C) Charterers to settle outstanding hire within 3 (Three) banking days after redelivery. Charterers to provide original vouchers for Owners' expenses/settlement within 90 days of final redelivery. If after 90 days vouchers are still awaited then the accounts are to be finalized based on vouchers actually submitted. Owners to refund on presentation to Charterers any amounts disbursed on Owners' behalf for which vouchers are submitted after that time.

D) With reference to Clause 5, it is agreed that the hire is to be considered correctly paid upon the confirmation from Owners' banker that such remittance is fully received as stated in the description clause.

E) In the event that the vessel is expected to be redelivered to the Owners prior to the expiry of the last 15 days period that would be covered by the next payment of hire Charterers shall be entitled to effect payment on hire on the basis of the estimated time necessary to complete the services. The estimated time necessary to complete the service to be mutually agreed between Owners and Charterers. For any hire exceeding such period to be paid immediately upon redelivery providing exceeding time not more than 2 days, otherwise hire to be continued being paid in advance.

F) Notwithstanding anything contained herein to the contrary, it is understood that if at any time during the currency of this Charter the hire payment shall become due on a Saturday, Sunday or holiday or outside normal banking hours, payment of hire may be made on the next banking day immediately following the date on which hire become due and such payment shall stand as "punctual and regular payment".

G) Charterers have the right to withhold from Charter hire during the period of this Charter such reasonable amounts due them for off-hire time and Owners' disbursement. But proper supporting statements are to be sent to Owners as soon as possible.

H) Hire to be remitted by TT to :

Owners' bank :

Probulk Carriers lts.
C/O EASTWIND INVESTMENTS
444 MADISON AVENUE SUITE 200
NEW YORK, N.Y. 10022 USA
Bank: NORDEA BANK FINLAND PLC. NEW YORK BRANCH
437 MADISON AVENUE
NEW YORK, N.Y. 10022 USA
SWIFT: NDEAUS3N
ABA: 026010786
Account: 8306163001

15/27

20

21

1671

RIDER CLAUSES TO CHARTER PARTY DATED 7ᵗʰ May , 2008
M/V "IOANIFIII" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION

**Clause 61 – Hire Payment - continued**

1) Non-Payment of Hire (Clause for Time Charter Parties)

a) If the hire is not received by the Owners by midnight on the due date, the Owners may immediately following such non-payment suspend the performance of any or all of their obligations under this Charter Party (and, if Owy so suspend, inform the Charterers accordingly) until such time as the payment due is received by the Owners. Throughout any period of suspended performance under this Clause, the vessel is to be and shall remain on hire. The Owners' right to suspend performance under this Clause shall be without prejudice to any other rights they may have under this Charter Party.

b) The Owners shall notify the Charterers in writing within 24 running hours that the payment is overdue and must be received within 72 running hours from the time hire was due. If the payment is not received by the Owners within the number of running hours stated, the Owners may by giving notice within 12 running hours withdraw the vessel. The right to withdraw the vessel shall not be dependent upon the Owners first exercising the right to suspend performance of their obligations under this Charter Party pursuant to sub-clause (a). Further, such right of withdrawal shall be without prejudice to any other rights that the Owners may have under this Charter Party.

c) The Charterers shall indemnify the Owners in respect of any liabilities incurred by the Owners under the Bill of Lading or any other contract of carriage as a consequence of the Owners' suspension of and/or withdrawal from any or all of their obligations under this Charter Party.

d) If, notwithstanding anything to the contrary in this Clause, the Owners choose not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of hire or a series of late payments of hire, this shall not be construed as a waiver of their right either to suspend performance under sub-clause (a) or to withdraw the vessel under sub-clause (b) in respect of any subsequent late payment under this Charter Party.

**Clause 62 – Bunker**

Bunker price and quantity to be agreed later:

Bunkers remaining on board at on delivery about ......... marite tons IPO plus about ......... metric tons MDO. Bunkers remaining on board at on redelivery to be about same quantities as on delivery. Prices both ends USD ......./ USD ........ per metric ton respectively for IPO / MDO. Cost of bunkers remaining on board as on delivery or to be paid with first hire payment. Estimated cost of bunkers remaining on board as on redelivery to be deducted from the last sufficient hire payment.

Owner' option to supply bunker to the vessel at any convenient port provided same will not interfere with Charterers' loading/discharging works.

Charterers' option to bunker prior delivery subject samo not interfere with cargo operations.

**Clause 63 – On/Off Hire Survey**

Joint on/off-hire surveys to ascertain vessel's condition and quantities of fuels remaining on board shall be carried out at delivery port or at first load port and at redelivery port. Joint on-hire survey to be carried out by independent surveyor on delivery in Owners' time unless otherwise concurrently with cargo operations and joint off-hire survey by independent surveyor on redelivery in Charterers' time. Joint on/off-hire survey expenses to be shared equally by Owners and Charterers.

**RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008**
**M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND**
**TRANSPORTATION**

**Clause 64 – Hold Cleaning**
Charterers' option to redeliver the vessel unclean against paying USD 5,000 - lumpsum in lieu of hold cleaning including removal of dunnage/lashing removal and disposal, except for USA/UK/Japanese ports where compulsory removal/disposal to be for Charterers' account, in which case, Charterers to pay USD 10,000 - lumpsum as in lieu of hold cleaning charge.

‹Hold conditions on delivery›
Vessel's holds on arrival first load port to be clean swept and washed down by fresh water and dried up so as to receive Charterers' intended cargoes in all respects, free of salt, loose rust scale and previous cargo residues to satisfaction of the independent surveyors. If the vessel fails to pass any hold inspection, the vessel should be placed off-hire from the time of rejection until the vessel passes the same inspection again and any actual expenses incurred directly thereby to be for Owners' account. In case vessel partly passes cleanliness inspection and Charterers start cargo operations then vessel to be off-hire pro rata in relation to the holds not available to Charterers.

‹Intermediate Hold Cleaning›
Upon completion of discharge of each cargo, the crew shall render customary assistance in cleaning all cargo compartments in preparation for the next cargo if required by the Charterers and if not prevented by any regulations or agreement whatsoever.  Such cleaning work shall be performed while the vessel is en route to next loading port, provided that this can be safely done and that the duration of voyage is sufficient or in port provided shore regulations permit and always in Charterers' time, risks and expenses. The Charterers shall pay to the Owners USD 700.00 per hold each time such cleaning is performed for normal cargoes and USD 1,000.- case cleaning after salt and/or sulphur and/or petcoke and/or scrap and/or bulk cement and/or cement clinker and/or concentrate. Any extra materials/chemicals/fresh waters that might be required as per Master/ Owners for such cleaning to be provided by Charterers accordingly.

The Owners will endeavour to effect such cleanings as best possible, but without any guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at the subsequent loading port and the Owners/vessel shall not be responsible for any consequences arising from the fact that the crew has been employed in cleaning and vessel to remain on-hire throughout.

Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section I or other applicable rules relating to the disposal of such substances.

**Clause 65 – Cable / Entertainment / Victualling**
Charterers to pay USD 1,300 per 30 days or pro rata for cable/ entertainment /victualling.

**Clause 66 – Bills of Lading / Letter of Indemnity**
Charterers and/or their agents are hereby authorised by Owners to sign, on Master's behalf, Bills of Lading as presented in accordance with Mate's Receipt and/or Tally Clerks' Receipt without prejudice to this Charter Party. Charterers are to be fully responsible and indemnify Owners for all costs and consequences directly/ indirectly arising out of the issue of the above mentioned Bills of Lading.

17/27

**22**

RIDER CLAUSES TO CHARTER PARTY DATED 7th May , 2008
M/V "IOANTHI" / ACC MARVEL INTERNATIONAL MANAGEMENT AND
TRANSPORTATION

Charterers will endeavour to ensure that original Bill(s) of Lading are tendered to Master upon vessel's arrival at discharging port. Should original Bill(s) of Lading not be available at the port(s) of discharge, Owners would allow Charterers to discharge cargo against a Letter of Indemnity in accordance to Owners' P & I Club wording signed by one authorised senior officer on Charterers' formal letter head. The original copy of the Letter of Indemnity to be forwarded to Owners' office as soon as the fax copy have been approved by the Owners.

Clause 67 – Padeye
Charterers have the option to weld padeyes on deck/hold at Charterers' time, risks and expenses. Same to be removed prior to redelivery. Charterers have the option to redeliver the vessel without removing padeyes by paying USD10.00 per padeye to the Owners.

Clause 68 – Breaking IWL
Notwithstanding mentioned trading exclusions, Charterers have the option to break IWL but always with Owners' prior approval which is not unreasonable withheld. If any, extra expenses to break IWL to be for Charterers' account and same not to exceed the London scale or Norwegian conditions whichever is applicable.

Vessel never to force ice nor push ice nor to follow ice breaker(s).

Clause 69 – Panama / Suez Canal Transit
The Owners confirm that the vessel shall be fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificates and equipment during the currency of this charter to comply with current regulations and requirements of both canals.

Clause 70 – Off-Hire for over 30 Consecutive Days
Should the vessel be placed off-hire more than 30 consecutive days, the Charterers have the right to cancel the balance period of this charter by giving notice to the Owners without prejudice to any other right the Charterers may have under this charter.

Clause 71 – Owners' Agent
The Charterers may agree their agents to attend Owners' matter such as delivery, redelivery, dry-docking, hospitalization, repatriation of crew, supply of vessel's stores and provisions, etc with the Owners paying Charterers' agents actual expenses including attendance fee, if any. The Charterers may also agree their agents to attend to trivial Owners' matters such as cash advance, crow mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any.

Clause 72 – Eligibility for Bunkering
The Owners confirm that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with U.S. Coast guard regulations set forth in title 33 chapter I subchapter c part 155 and 156 code of federal regulations. The Owners also confirm that the vessel is eligible for bunkers in any other country.

Clause 73 – Deviation / Put Back
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or accident to the Master, Officers, crew or any person on board the vessel other than persons travelling by the Charterers' request, or by reason of sending stowaway, salvage or by reason of the refusal of the Master, Officers or crew to do their duties or any Owners' matters the payment of hire shall be suspended from the time of inefficiency in part or at sea until the vessel is again efficient in the same position or regain a point of progress equivalent to

18/27

23