**Exhibit C**

**To**

**PETITION TO RECOGNIZE, CONFIRM
AND ENFORCE A FOREIGN ARBITRATION AWARD**

## VERIFICATION and CERTIFICATION OF THE ARBITRATION AWARD

Vassilios Livanos, pursuant to the provisions of 28 U.S.C. § 1746, hereby declares and states as follows:

I am the Commercial Director and a duly authorized agent of Probulk Carriers Limited, which is the Petitioner in this action.

I am familiar with Petitioner Probulk Carriers Limited's disputes with Respondent Marvel International Management and Transportation, I am familiar with the Final Arbitration Award referenced herein and I am familiar with the Petitioner's efforts to collect the amounts due under the Final Arbitration Award.

The attached is a true and certified copy of the Final Arbitration Award, which was rendered in London on January 28, 2013, in favor of the Petitioner Probulk Carriers Limited and against the Respondent Marvel International Management and Transportation.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 16, 2014
New York, New York

Vassilios Livanos

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

PROBULK CARRIERS LIMITED OF NEW YORK, USA

**CLAIMANTS**
(Disponent Owners)

-and-

MARVEL INTERNATIONAL MANAGEMENT
AND TRANSPORTATION OF ISTANBUL,
TURKEY

**RESPONDENTS**
(Charterers)

'IOANTHI'

Charterparty dated 7 May 2008

FINAL ARBITRATION AWARD

WHEREAS:

A.     By a time charterparty on amended terms of the NYPE 93 Form with additional
clauses and including a clean recap dated 7 May 2008 (the 'charterparty'),
Probulk Carriers Limited (the 'owners') agreed to let the bulk carrier
'IOANTHI' (the 'vessel') to Marvel International Management and
Transportation (the 'charterers') for a period starting between 31 December

1

2008 and 15 March 2009 and lasting up to earliest 15 January 2010 and latest 28 February 2010.

B.  Clause 17 of the charterparty provided that should any dispute arise between owners and charterers, the matter in dispute shall be referred to arbitration in London as per clause 48. Clause 48 provided that English law was to apply and an arbitrator to be appointed by each party, the reference shall be to two arbitrators. The terms of the London Maritime Arbitrators Association current at the time when the proceedings commenced to apply.

C.  Disputes having arisen between the parties, as more fully specified hereunder, the owners appointed the undersigned Timothy Rayment of 47 Castelnau, London SW13 9RT, and the charterers appointed the undersigned Lindsay Gordon now of William Hunter House, 20 Western Road, Brentwood, Essex CM14 4SR to act as arbitrators. Both appointments were made on the terms of the London Maritime Arbitrators Association 2006 and pursuant to paragraph 5 thereof they apply to this reference. Further, pursuant to paragraph 6 thereof as well as clauses 17 and 48 of the charterparty, the seat of the arbitration is in England. We are both full members of the LMAA and the Baltic Exchange, London.

D.  In these arbitration proceedings the owners say they are entitled to and duly claim (i) payment in the amount of US$1,080,409.90 as referred to in the first hire invoice and the value of bunkers on board; (ii) further and alternatively, a declaration to the effect that they are entitled to the sum of US$10,820,500 as set out in Schedule A – Schedule of Loss, alternatively damages; (iii) further and alternatively, the owners recoverable loss as the difference between the charterparty hire rate of US$43,500 per day pro rata for the balance of the charterparty (323 days) and the market rate for that period as at the date of breach. Owners contend that the market rate is in the order of US$10,000 per day pro rata; and (iv) interest and costs.

E.  Charterers say there were prevented from making any hire payments to owners by reason of an English Freezing Order and also a Rule B attachment in the United States of America.  Charterers said therefore they could not take delivery.  Correspondence was exchanged between the parties over several weeks in February 2009.  Finally, on 27 February 2009 owners proceeded to accept charterers' repudiation of the charterparty which effectively ended on this date.

F.  The owners were originally represented by solicitors, Mills & Co, Newcastle upon Tyne.  On 24 August 2012 the tribunal was informed that solicitors, Winter Scott, London were instructed to represent owners,  Charterers were represented by Hill Dickinson LLP, London, but shortly after service of Defence Submissions, have taken no further part in any correspondence.  Although charterers have been copied in to all correspondence, they have not responded at all.  The dispute has been dealt with on documents alone, neither party requesting an oral hearing.

G.  Winter Scott, solicitors acting for owners, instructed Mr S. Everton, shipbroker, to provide an expert opinion on the market rate for the charter.

NOW WE, the said Timothy Rayment and Lindsay Gordon having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the Submissions and evidence and having given due weight thereto and finding ourselves in agreement, each with the other for the Reasons annexed hereto and forming part thereof, DO HEREBY MAKE, ISSUE AND PUBLISH this our ARBITRATION AWARD as follows:-

1.  WE FIND, HOLD AND DECLARE that the owners' claim succeeds in the amount of US$8,860,293.50 and no more.

2. **WE HEREBY AWARD AND DIRECT** that the charterers shall pay to owners the sum of US$8,860,293.50 (Eight million eight hundred and sixty thousand two hundred and ninety three United States Dollars and fifty cents) together with interest thereon at the rate of 5% per annum and pro rata compounded at three-monthly rests from 15 August 2009 until the date of payment.

3. **WE FURTHER AWARD AND DIRECT** that the charterers shall bear their own costs and shall pay the owners' costs of this reference, for the assessment of which, if not agreed, we hereby reserve our jurisdiction, together with interest thereon at the rate of 4.5% per annum and pro rata, compounded at three-monthly rests from the date hereof until the date of payment.

4. **WE FURTHER AWARD AND DIRECT** that the charterers shall pay the costs of this our Final Arbitration Award provided, however, that if in the first instance the owners shall have paid all or any part thereof they shall be entitled to the immediate reimbursement from the charterers for the sum so paid, together with interest thereon at the rate of 4.5% per annum and pro rata, compounded at three-monthly rests, from the date of such payment until that of reimbursement.

5.   **WE HEREBY DECLARE** that this our final Arbitration Award is final as to all matters determined herein.

Dated in London this 28th day of January 2013

...................................
Timothy Rayment

...................................
Witness

...................................
Lindsay Gordon

...................................
Witness

**'IOANTHI'**

**Charterparty 7 May 2008**

**REASONS FOR AND FORMING PART OF**

**THE ARBITRATORS' FINAL ARBITRATION AWARD**

## INTRODUCTION AND BACKGROUND

1.    The dispute that is the subject of this arbitration arises between the parties to a time charterparty on an amended NYPE 93 Form with additional clauses and including a clean recap dated 7 May 2008.  The owners of the bulk carrier 'IOANTHI' who are Probulk Carriers Limited,  agreed to let the vessel to charterers Marvel International Management and Transportation, starting more than 6 months hence between 31 December 2008 and 15 March 2009 and for a period lasting up to earliest 15 January 2010 and latest 28 February 2010.

2.    In accordance with the requirements of Clause 14 of the charterparty, on 2 February 2009 owners provided 14 days approximate notice of delivery for 16 February and narrowed the laycan to a 10-day spread of 12-21 February.

3.    On 4 February owners served a further notice upon charterers, indicating that the vessel might be delivered earlier than 16 February (albeit, self-evidently, still within the delivery window for which the charterparty provided).

4.    This dispute has its origins when on 6 February 2009  owners received a message from charterers saying that they were prevented from making any hire payments to owners by reason of an English Freezing Order and also a Rule B attachment in the United States.  Charterers told owners *"to ask Marvel to take delivery is pointless, Marvel can't"*.  On the same day, owners responded to charterers arguing that neither the English Freezing Order nor the Rule B attachment actually prevented payment of hire under the Charterparty or justified any failure to pay hire thereunder, and stating that *"your current*

conduct in indicating an intention (1) to refuse delivery and (2) to refuse to pay hire clearly evidences an intention not to be bound by the terms of the charterparty and as such amounts to an anticipatory repudiatory breach". Owners refrained from accepting that alleged repudiation as bringing the charterparty to an end and instead stated that they would allow charterers a short time "to cure this anticipatory repudiatory breach" (giving them until 11 February 2009 to confirm, effectively, that hire would be paid). Owners ended by stating that "If you are unable to provide these confirmations, we will have no alternative but to hold you in anticipatory repudiatory breach of contract and seek very significant damages as a consequence".

5. We address what followed in greater detail later in these reasons but for now suffice to say protracted correspondence ensued without movement of the parties' positions. Owners provided charterers with a 5 day delivery notice and a further delivery notice, while declining to accept any of the charterers' communications as a repudiation or renunciation so as to bring the charterparty to an end.

6. Owners then pressed charterers providing them on 17 February with one further opportunity to accept delivery of the vessel and thereafter arrange payment of the sum of US$1,080,409.90 representing the first hire amount and the value of the bunkers on board. Charterers did not respond, but later repeated their position with reference to the English Freezing Order and Rule B attachment.

7. Correspondence from the charterers then dried up, resulting in owners accepting charterers' repudiation or renunciation of the charterparty on or about 27 February 2009.

## THE CHARTERPARTY

8.    The charterparty contained inter alia the following terms.

"...

*Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for ~~about~~...a time charter period via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits starting between 31st December 2008 and 15th March 2008 and lasting upto earliest 15th of January – latest 28th of February 2010 ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...*

...

*14. That if required by Charterers, time not to commence before... 31st of December 2008... ......and should vessel not have ~~given written notice of readiness~~ been delivered on or before ... ... ... ... ... ... ... ... ... ... ... ......*
*.....15th March, 2009 .....~~but not later than 4 p.m.~~  Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.*
*Owners to give 25/20 days vessel's full itinerary and Owners to give 14 days approximate notice of delivery and to narrow lay/can in 10 days spread. ... ....See Clause 60.*

...

*17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to Arbitration in London as per Clause 48 ...*

*Clause 48 – Arbitration*
*Arbitration in London and English law to apply.*

3

All disputes arising out of this contract which cannot be amicably resolved shall be referred to Arbitration in London.

Arbitration to be appointed by each party, the reference shall be to two Arbitrators. But if one party failing to appoint Arbitrator within 14 days after another party has appointed one, then it will become sole Arbitrator for the Arbitration. The Arbitrators and the umpire, if appointed, shall be the commercial men conversant with shipping knowledge, and the members of the London Maritime Arbitrators' Association or otherwise qualified by experience to deal with shipping disputes.

The contract is governed by English law and there shall apply to Arbitration proceedings under this clause the terms of the London Maritime Arbitrators' Association current at the time when the Arbitration proceedings are commenced.

### Clause 61 – Hire Payment

A)     First 15 days hire and value of bunkers on delivery to be paid within 3 (Three) banking says after vessel's delivery. Charterers are entitled to deduct from last sufficient hire payments estimated Owners' disbursements, but maximum USD500.00 per port as well as estimated bunkers on redelivery value.

...

C)     Charterers to settle outstanding hire within 3 (Three) banking days after redelivery.

...

I)     Non-Payment of Hire Clause for Time Charter Parties

a)     If the hire is not received by the Owners by midnight on the due date, the Owners may immediately following such non-payment suspend the performance of any or all of their obligations under this Charter Party (and, if they so

4

*suspend inform the Charterers accordingly) until such time as the payment due is received by the Owners. Throughout any period of suspended performance under this Clause, the vessel is to be and shall remain on hire. The Owners' right to suspend performance under this Clause shall be without prejudice to any other rights they may have under this Charter Party.*

*b) The Owners shall notify the Charterers in writing within 24 running hours that the payment is overdue and must be received within 72 running hours from the time hire was due. If the payment is not received by the Owners within the number of running hours stated, the Owners may by giving written notice within 12 running hours withdraw the vessel. The right to withdraw the vessel shall not be dependent on the Owners first exercising the right to suspend performance of their obligations under this Charter Party pursuant to sub-clause (a). Further, such right of withdrawal shall be without prejudice to any other rights that the Owners may have under this Charter Party. ..."*

## FURTHER FACTS

9.   As has been set out above, on 6 February charterers sent owners a message relating to the inability to make any hire payment due to court action in England and USA and owners responded the same day saying these actions did not prevent payment of hire under the charterparty. Owners considered non-payment of hire amounts to anticipatory repudiatory breach and requesting payment by 11 February and served a 5 day delivery notice under the

5

charterparty. On 9 February, charterers repeated that they could not take delivery of the vessel. On this day, owners served a 3 day delivery notice.

10. On 10 February, owners advised that they must mitigate their losses and re-fix the vessel without delay. Thereafter, owners declined to accept any of the charterers' communications as repudiation or renunciation so as to bring the charterparty to an end. Instead, on 11/12 February they served a delivery notice on charterers. Charterers responded on 12 February saying that their situation remained unchanged and they refused to accept the delivery notice.

11. Owners responded by pointing out that although the charterers' messages from 9 February were headed *"without prejudice"* they were not so. Therefore, owners said, that if it was charterers' intention not to accept the vessel, they needed to say so in an 'open' message soonest because until they did this, owners had 'no obligation and no legal right, to sublet the vessel to another charter until they brought the current charterer to an end'.

12. There was a further stalemate in communications until 17 February when owners offered one further opportunity to accept delivery of the vessel and payment of US$1,080,409.90 representing the first hire amount and the value of the bunkers on board within 3 banking says of delivery in accordance with clause 61 of the charterparty, failing which owners would bring a substantial claim against charterers. There was no response from charterers so on 19 February, owners sent charterers an anti-technicality notice under clause 61, requiring payment of hire within 72 hours and threatening withdrawal in the absence of payment.

13. There followed a tit-for-tat exchange of correspondence and on 23 February, owners said:

*"...Nonetheless, and without prejudice to Charterers' repudiatory conduct, Owners are prepared to give Charterers a further period of 3 days, i.e. until*

*18-00 GMT on 26 February 2009 to confirm unequivocally that they do intend to perform the Charter and to evidence such intention by: (1) paying all sums in respect of hire and bunkers due to date; (2) providing instructions for the Vessel; and (3) taking steps to sublet the Vessel. In the absence of a response and or clear statement to the contrary it will be assumed that Charterers do not intend to perform. Owners look forward to Charterers' confirmation as a matter of urgency so that steps can be taken to fix the Vessel and mitigate loss".*

There was no further response or payment from charterers.

14. Owners concluded that charterers were in repudiatory breach of the charterparty in their submissions they set out the following reasons:-

*"(1) Repudiation by way of renunciation is established where there is an absolute refusal by one party to perform his obligations under the contract, or an unambiguous assertion by that party that he will be unable to perform when the time for performance arrives.*

*(2) Such a refusal is demonstrated where there is an express refusal to perform or express declaration of inability to perform, or, in the alternative, where the actions of the party in default are such as to lead a reasonable man to conclude that that party no longer intends to be bound by the provisions of the breach.*

*(3) Where the nature of the renunciation is such that it is continuing or is repeated by the party in default, the right to accept it arises afresh with each manifestation of the breach.*

*(4) As a result, the right to bring about the termination of a contract for repudiation will, where the repudiation is continually or repeatedly*

*expressed or manifested, will be available for exercise notwithstanding any earlier affirmation or failure or refusal to accept it as bringing the contract to an end.*

(5) *On more than one occasions, Marvel (in the premises of the matters stated above) made it clear that they were unable or unwilling to perform under the Charterparty – their repeated assertions to the effect that the English Freezing Order and the Rule B attachment in the U.S. prevent any payment to Probulk were tantamount to a declaration that they were unable to perform and/or that they would be unable to perform at any stage in the foreseeable future; similarly, their refusal to accept delivery of the Vessel under the Charterparty was unequivocal.*

(6) *Accordingly, Marvel's conduct (and/or inactivity) was plainly and unequivocally renunciatory in nature.*

(7) *It follows that Marvel's conduct (and/or inactivity) was plainly and unequivocally renunciatory in nature.*

(8) *In this respect, the renunciatory nature of that conduct was unwavering – up to the time of Probulk's communication of 23rd February 2009, Marvel took no steps to perform their obligations under the Charterparty (or, indeed, do other than indicate that they would be unable to perform thereunder when the time for performance came); following that communication from Probulk, Marvel failed to respond within the stipulated deadline or at all, and took no steps to perform their obligations under the Charterparty (or, indeed, indicate that they would be unable to perform thereunder when the time for performance came).*

(9) *Accordingly, Marvel's conduct following the passing of the deadline to which Probulk referred in their communication of 23rd February 2009, and a fortiori when viewed against the background of their earlier conduct, was self-evidently repudiatory.*

(10) *In the premises, and in the absence (following Probulk's message of 23rd February 2009) of any indication on the part of Marvel of any intention to perform which contrasted with their earlier unequivocal indications to the effect that they were unwilling and/or unable to perform, Probulk were entitled to accept Marvel's conduct as a repudiation and to terminate the Charterparty accordingly."*

15. In the circumstances, on 27 February owners proceeded to accept charterers' repudiation of the charterparty so as to bring the same to an end. In effect, there had been 3 weeks between initial correspondence between the parties and termination of the charterparty.

16. Having accepted as a fact charterers' repudiation of the contract owners claim that charterers are liable in damages. Further and alternatively, and in any event, owners claim they are entitled to payment in the amount of US$1,080,409.90 as referred to in the first hire invoice which sum remains due and owing, alternatively they claim damages in a like amount.

17. Without prejudice to owners' right to payment in respect of the sum of US$1,080,409.90 as referred to above owners say is, the measure of owners' recoverable loss is the difference between the charterparty hire rate (i.e. US$43,500 per day pro rata) for the balance of the charterparty period and the market rate for the vessel for that period as at the date of breach. Owners say that any assessment of the applicable market rate is a matter for expert evidence. However, owners contend that that rate is of the order of US$10,000 per day pro rata. Accordingly, owners say they are entitled to damages in the

9

amount of US$10,820,500 as set out in the calculation of loss which appears in the schedule of loss.

18. Owners claim interest upon any sums found due to them:

"(a) *Pursuant to the equitable jurisdiction of the Tribunal, at a commercial rate and compounded at quarterly rests, for such period as the Court shall consider just.*

(b) *Further and alternatively, as damages for the late payment of the sums due, at a commercial rate as stated above, and (again) compounded at quarterly rests, for such period as the Tribunal shall consider just.*

(c) *Further and alternatively, pursuant to the Late Payment of Commercial Debts (Interest) Act 1998 as amended, at the rate therein provided for (which Probulk will contend is 8% above the "official dealing rate" referred to in Article 4 of the Late Payment of Commercial Debts (Rate of Interest) (No. 3) Order 2002), for such period as the Tribunal shall consider just.*

(d) *Further and alternatively, pursuant to section 49 of the Arbitration Act 1996 at a commercial rate and compounded at quarterly rests as stated above, and for such period as the Tribunal shall consider just."*

Owners claim costs.

19. Attachments to the Claim Submissions included a Schedule of Loss. Based on a termination date 27 February 2009, earliest redelivery date 15 January 2010, daily rate of US$43,500 over 323 days, the total revenue from the charterparty after a commission at 3.75% was US$13,523,607.00. A similar calculation based on US$10,000 per day provided a total revenue of US$3,108,875.00.

10

Owners calculate that the difference between the two revenues, ie US$10,414,732.00 is their total loss.

20. Schedule 1 attached to the Claim Submissions consists of selected correspondence which forms part of the Claim Submissions.

21. Charterers served their Defence Submissions on 22 May 2009. Charterers say that the Rule B attachment for more than US$12m prevented them from paying hire in accordance with clauses 4 and 61 and entering into the charterparty. They also say that the English court order prevented charterers to *"in any way dispose of, deal with or diminish the value of his assets whether they are in or outside England and Wales"*. Charterers are also of the view that a suggestion by owners to use a Euro account is contrary to the charterparty.

22. According to charterers, a further complication existed because the freezing order required them to notify Samsun if *"Marvel cause or permit any hire, freight, or other payments properly due to Marvel to be received other than into a bank account in the name of Marvel who particulars ... have previously been notified to* [Samsun]*"*. Charterers point out that owners are no doubt aware that Samsun are said to have gone into administration and that their associated company in the US has filed for Chapter 11 bankruptcy. Charterers put forward the possibility that administrators may allow the £250,000 paid into court as security to be released and thus discharge the Freezing Injunction so charterers can *"renegotiate this charter at a sensible rate"*. (Emphasis added.)

23. In submissions charterers denied that there was ever a charterparty and/or put owners to strict proof on six main issues:-

    (i)     That the parties entered into a charterparty at all;

11

(ii) That the charterparty attached to the Claim Submissions is evidence of any clean fixture and or fixture recap (if any);

(iii) That the vessel was seaworthy;

(iv) That the vessel was ready and in every way fitted for the ordinary cargo service;

(v) That Probulk were the disponent owners of the vessel;

(vi) That Daeyang had not withdrawn the vessel from service to Probulk.

24. In respect of Submissions (iii) and (iv) above, charterers refer to the vessel undergoing a diving inspection 4 to 6 February 2009, a further inspection on 18 March and remaining idle or undergoing repairs at Malta until 18 or 29 March, as evidenced by a Lloyd's MIU record.

25. In Submissions (v) and (vi) above, charterers say they are informed that there were difficulties between Probulk and disponent owners up the line, Daeyang (HK) Shipping Co. Ltd.

26. Charterers deny that owners are entitled to damages, but if the Tribunal find they are so entitled, that owners mitigated their loss by entering the vessel into the market on best possible terms. For support, charterers rely on the Lloyd's MIU record and quote market rates for ten similar vessels over unspecified periods. The daily rates varied from US$12,750 to US$30,500. Mr S. Everton, owners' expert, concludes in his report that the market rate for 'IOANTHI' would have been US$10,000 per day. We consider this point in due course.

27. Charterers conclude in their Submissions that if owners are entitled to damages, the correct sum is US$4,196,982.00. This is based on US$13,523,607.00 less 323 days x US$30,000, less commission, ie US$13,523,607.00 minus US$9,326,625.00 = US$4,196,982.00.

28.	In response to the charterers' Defence Submissions, owners served a Reply on 24 August 2012. In summary, referring to the Defence Submissions:

> (i)	A charterparty was entered into, albeit an unsigned 'working copy' was attached to owners' Submissions.
>
> (ii)	A 'clean' recap fixture was attached to the Reply.
>
> (iii)(iv)	The burden of proof of 'unseaworthiness' or 'lack of readiness' lies on charterers and they had not provided full particulars.
>
> (v)(vi)	The allegations lacked particularity and, in essence, charterers were unable to fulfil their obligation to pay hire.

29.	In their Reply owners said it was noteworthy that the only case advanced by charterers on liability was that there was no binding charterparty, and this was wrong. Owners have sought to assist us to decide the proper measure of an owners' loss by referring us to the 'ELENA D'AMICO' [1980] 1 Lloyd's Rep. 75 and the 'WREN' [2011] 2 Lloyd's Rep. 370 in circumstances of a repudiatory breach of a charterparty by the charterer where there is a market for a replacement charterparty of equivalent duration at the time of charterers' repudiatory breach, the loss is the difference between the charterparty rate and the market rate.

30.	As it appears to be common ground between the parties that there was a market for a replacement charter at the date of the repudiatory breach / renunciation, the only matter of substance for us to decide is the proper market rate. Owners say the figure is US$10,000 per day; charterers say US$30,000. The actual charterparty rate was US$43,500.

31.	Finally, we should say a brief word in regard to the procedural background. On 7 September 2012, Hill Dickinson confirmed that they were no longer

13

instructed on behalf of charterers. They were not replaced. Thereafter, owners, represented by Winter Scott, arranged for transmission of relevant documents to be served in Turkey by Fora Law in accordance with Turkish law. Service was confirmed. The tribunal ordered that LMAA Questionnaires be exchanged by 25 October 2012. There was no response from charterers so a further order was made on 30 October; again, there was no response from charterers. Owners served a completed Questionnaire dated 23 October 2012 attached to their Reply Submissions dated 24 August 2012. There may be a slip in that the Questionnaire should have been dated 23 August 2012 rather than 20 October 2012. Mr Everton's expert report was served on charterers on 5 November 2012 by facsimile, supported by a transmission slip. There has been no communication from charterers since 7 September 2012.

## OUR FINDINGS

32.    We start by saying that while we have taken cognizance of the sanctions imposed on the charterers, both in this country and the United States of America, we feel bound to say that this unfortunate situation should not interfere with our finding of facts in this matter. We would also add that we are not privy to the company structure of the charterers.

33.    In their Defence Submissions, their primary case is that the charterparty and the recap had no validity. While admitting notice of delivery, charterers deny that this was in relation to any valid charterparty.

34.    Charterers have not provided us with any particulars or persuasive evidence in respect of the above allegation. Accordingly, we accept owners' Reply that the working copy of the charterparty attached to the Claim Submissions, which was signed by owners, accurately reflect the terms agreed between Marvel as charterers and Probulk as owners. We further accept that the 'clean' fixture recap dated 7 May 2008 attached to the owners' Reply confirmed the identity

of the parties, the charterparty, rate and other relevant matters. We further accept that in contemporaneous correspondence between the parties, it is clear that charterers have accepted the existence of a charterparty.

35. Charterers' second main contention, based on the Lloyd's MIU report recording the vessel's movements, is that while the vessel was at Malta, between 4 February 2009 and 18/29 March 2009, she underwent a diving inspection and was either idle or under repair for that period, ie about 6 to 8 weeks.

36. We have not been provided with any particulars from the charterers that the period at Malta rendered the vessel unseaworthy or not ready. A diving inspection and underwater cleaning occupied about 3 days on the vessel's arrival at Malta on 4 February. A further inspection on 18 March 2009 occupied one day only. These are only brief periods and do not enable us to conclude anything other than the fact that the periods do not equate to, or establish, unseaworthiness or non-readiness. We accept that owners are right in their Reply when they draw attention to the fact that in the messages exchanged between the parties appended to the Claim Submissions, there was no hint from charterers of an allegation that the vessel was unseaworthy or not ready for delivery at the time at which she should have been accepted by charterers. The vessel was offered for delivery to charterers on 12 February 2009 and there was obviously ample time after arrival at Malta on 4 February to carry out any underwater inspections and cleaning.

37. The third main contention pleaded by charterers is that there were difficulties between owners (Probulk) and disponent owners up the line (Daeyang). No particulars have been provided by charterers for us to consider and charterers have not advanced a positive case relating to the relationship between owners and disponent owners. We are therefore bound to conclude that charterers have

not provided us with anything to justify repudiation or renunciation of the charterparty.

38. In their Defence Submissions, charterers have said that if we find there was a valid charterparty – which we have – owners are put to strict proof that the vessel complied with the terms of the charterparty. At best, this is a broad brush pleading which has not been particularised. Charterers have not told us why, in their view the 'vessel' did not comply with the terms of the charterparty. In these circumstances we are left with no option except to conclude that the 'vessel' did comply with the terms of the charterparty.

39. We accept the owners' contention that the only case advanced by charterers on liability is that there was no binding charterparty. We have concluded that there was a binding charterparty. The fact of the matter is that charterers did not accept delivery of the vessel because they did not comply with clause 61A (Hire Payment), that the first 15 days hire and value of bunkers on delivery, were to be paid within 3 banking days, ie by 18 February 2009. Some patience was shown by owners in that it was not until about 15 days after delivery, ie on 27 February, that owners proceeded to accept charterers' repudiation or renunciation of the charterparty.

40. During the course of correspondence between the parties, charterers floated the idea that if administrators allowed the £250,000 security paid into the English Court for the Freezing Injunction to be released, and thus discharge the Freezing Injunction, charterers could negotiate the charter at a 'sensible rate'. This strikes us as a highly speculative and unworkable idea. Charterers have provided no evidence that they actually took any steps to realise this suggestion. Based on the charterers' assessment of market rates set out in their Defence Submissions the average is US$20,840/day. Thus, 15 days hire would amount to US$312,600. Charterers would have to find this figure, plus the value of the bunkers, within 3 banking days after delivery. Even allowing for

exchange rates (sterling/dollar) we do not see the suggestion put forward by charterers as being realistic or a serious basis upon which owners could have considered before entering into the charterparty. Finally, in charterers' relevant message of 10 February, suggesting the above proposal, there is a telling end to the message. Charterers say *"When the market improves, no doubt full and proper commercial relations can be restored"*. This speaks for itself. Charterers were distinctly uncomfortable entering into a contract at a peak daily rate of US$43,500 per day.

41. Charterers have told us in their Defence Submissions that the applicable market rate is a matter of expert evidence. While not adopting this approach themselves, they sought to quote rates, the origins of which are unknown, for ten 'similar' vessels. The average can be calculated to be US$20,840/day. However, there is quite a range in deadweights, ie from 32,251dwt to 47,324dwt. The age of the vessels covers quite a large spread, from 1985 to 2001. Charterers have pleaded a daily rate of US$30,000 for 323 days in their calculation of damages due to owners, but have not explained the basis for this figure.

42. We have considered the expert report of Mr Everton, submitted on behalf of owners. In his report Mr Everton has considered whether there was an available market for a period of charter, say 12 months, on the same terms as the fixture in this case, if so, what was the market rate and, why if US$30,000 daily is not correct, why it is incorrect.

43. In his report, Mr Everton has taken account of a range of market sources and also illustrated the dramatic decline in rates between 1 May 2008 and 3 June 2008 albeit the market was rising fairly sharply from 5 February 2009. Mr Everton concluded that in February 2009 there was an available market. This seems to be common ground between the parties, so we have only to decide what a realistic rate was. Mr Everton has concluded that the rate for a 12 month

charter for the 'IOANTHI' open in Malta on 27 February 2009, would have been in the region of US$10,000 daily.

44.   Mr Everton has annexed the JEHMI graph to his report. This is published by Icap, formerly JE Hyde and we are told that the graph is based on modern 45,000 dwt Handymax types. The graph shows the market rate improving from late January 2009 and increasing fairly steeply and steadily up to 9 March 2009. Based on the graph alone it seems to us that the daily rate of US$10,000 occurred about mid February 2009. Between mid and late February 2009, the daily rate was between US$10-15,000. While it is not possible to conclude a precise market daily rate based on the graph alone, we have concluded that a fair figure based on the information before us is US$15,000 daily.

45.   We accept the principles referred to in the 'ELENA D'AMICO' [1980] Lloyd's Rep. 75 and the 'WREN' [2011] 2 Lloyd's Rep. 370 as set out in the owners' Reply. The correct measure of the owners' losses in the case of a repudiation such as in the present case is the difference between the contract rate and the market rate for a replacement charterparty for the balance of the period.

46.   Mr Everton has provided reasons why he thinks the charterers' method for settling on an applicable rate of US$30,000 is wrong. The reasons relate to incompatible charterparty duration, rates for fronthaul timecharter trips and incorrect geographical locations. While this may be fair comment, it seems to us that there are numerous factors which can affect a market daily rate. It is not an exact science.

47.   We have concluded, based on the evidence put before us, that charterers repudiated the charterparty.

48.   It is common ground between the parties that any financial loss incurred by owners as a result of repudiation or renunciation of the charterparty by

charterers, should be based on 323 days, ie from 27 February 2009 to 15 January 2010. This is the period from delivery until the earliest date set out in the charterparty, line 15.

49. Owners have claimed that their total loss should be based on the difference between the revenue based on the charterparty rate of US$43,500 per day, ie US$13,523,607.00 allowing for commissions, and the revenue based on US$10,000 daily, which again allowing for commission would be US$3,108,875.00. The difference amounts to US$10,414,732.00.

50. Based on the foregoing, in which we have decided that the day rate would have been US$15,000 we have calculated that the total loss suffered by owners is, as follows:

| | |
|---|---|
| Revenue from the charterparty at US$43,500 per day | US$14,050,500 |
| Less commission at 3.75% | US$526,893.75 |
| Total revenue | US$13,523,606 |
| | |
| Revenue from charterparty at US$15,000 per day | US$4,845,000 |
| Less commission at 3.75% | US$181,687.50 |
| Total revenue | US$4,663,312.50 |

Amount of damages US$13,523,606 – US$4,663,312.50 =   US$8,860,293.50

51. The owners are of course entitled to interest and we have awarded this at the rate of 5% per annum and pro rata, compounded at three-monthly rests, which we consider to be a fair average commercial rate of interest for the period in question. Further, we have awarded this to run from 15 August 2009 which is when the full amount of damages accrued. We consider that this is a case where costs should follow the event in the usual way. We have accordingly awarded the owners their costs on the standard basis.